UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

**MEMORANDUM OPINION
& ORDER**

09 Cr. 870 (PGG)

SAUL OLAVARRIA,

Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Saul Olavarria is charged with violating the felon-in-possession statute, 18 U.S.C. § 922(g)(1).  During a traffic stop in the Bronx on February 20, 2009, New York City police ("NYPD") officers recovered a loaded firearm from Defendant's person.  The Defendant has moved to suppress the firearm and all other evidence recovered after the traffic stop, arguing that its seizure violates the Fourth Amendment.  (Dkt. No. 4)  The Government now concedes that the initial stop of Olavarria's vehicle was unconstitutional, but argues that the defendant's resistant conduct after the stop attenuated the connection between the unlawful traffic stop and the seizure of the firearm.  For the reasons stated below, Defendant's motion to suppress will be granted.

I.      **PROCEDURAL HISTORY**

Shortly after Olavarria's arrest, a criminal complaint was filed against him in Supreme Court of the State of New York, Bronx County, charging him with criminal possession of a weapon and resisting arrest.  Olavarria filed a motion to suppress the firearm, and a hearing was scheduled for October 6, 2009.  (Dkt. No. 4, Ex. A)  On September 9, 2009, however, the U.S. Attorney's Office in this District obtained an indictment charging Olavarria with being a

felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and the Bronx County

District Attorney subsequently moved to dismiss the state charges against Olavarria.

   The Defendant filed his motion to suppress in this action on November 20, 2009

(Dkt. No 4).  The motion sought suppression of

> a firearm and other tangible evidence alleged to have been seized from Mr.
> Olavarria after officers of the New York [City] Police Department gun squad
> improperly and without probabl[e] cause or any other legitimate basis, stopped the
> vehicle registered to and driven by Mr. Olavarria.

(11/20/09 Def. Br. 1)  The Government's opposition brief argued that the traffic stop of the

defendant was lawful because "the officers had probable cause to believe that the defendant

[had] committed a traffic violation, namely driving with a defective brake light, justifying the

stop of Olavarria's car."  (12/2/09 Gov't Br. 6)  The Defendant then submitted a declaration

asserting that the brake light in question – a center brake light on his sport utility vehicle – was

not defective at the time of the stop.  (12/10/09 Olavarria Decl. (Dkt. No. 8) at ¶ 10)  This Court

concluded that a hearing was necessary to resolve this factual dispute.

   The parties disagreed as to the appropriate scope of the hearing, however.  The

Defendant argued that "the scope of the motion to suppress and the evidentiary hearing is not

limited to the vehicle stop but extends to all the factual circumstances surrounding the vehicle

stop, the search of the vehicle, the search of Mr. Olavarria and the seizure of the firearm and

related factual circumstances."  (2/25/10 Def. Ltr. 2)  The Government contended that Olavarria

had raised a material issue of fact only as to the basis for the stop of his vehicle, and that the

hearing should be limited to evidence concerning that issue.  (2/24/10 Gov't Ltr. 2)  Because the

Defendant's declaration asserted only that his "vehicle did not have a defective brake light

during the time [he] was driving it on February 20, 2009," (12/10/09 Olavarria Decl. (Dkt. No. 8)

at ¶ 10), this Court accepted the Government's argument and ruled that the evidentiary hearing

would be limited to whether the stop of Olavarria's vehicle was proper.[1]  (3/2/10 Tr. 10)  The

parties then offered evidence over four days of hearings between March 2, 2010 and June 9,

2010.  (See 3/2/10 Tr.; 3/10/10 Tr., 4/19/10 Tr.; 6/9/10 Tr.)

        On July 23, 2010, after the close of the testimony, this Court issued an order (1)

noting the Government's contention that the allegedly defective center brake light on Olavarria's

vehicle constituted a traffic violation; and (2) directing the Government "to supply the Court

with the relevant citation to New York vehicle and traffic law supporting this contention by July

30, 2010."  (Dkt. No. 30)  The Government sought additional time to respond (Dkt. No. 32), but

in an August 18, 2010 letter, the Government conceded that the defendant's defective center

brake light did not violate any provision of New York Vehicle and Traffic Law.  (8/18/10 Gov't

Ltr.)  In a September 9, 2010 brief, the Government further conceded that "the Officers' stop of

the defendant's vehicle on February 20, [2009] on the basis that the defendant committed a

traffic violation was an improper stop."  (9/9/10 Gov't Br. 6)

        The Government contended that suppression was not warranted, however,

because "the defendant's conduct following the stop of his vehicle sufficiently attenuated the

discovery of the loaded firearm from the initial impermissible traffic stop and thereby dissipated

any taint resulting from the impermissible stop."  (Id.)  Reversing course as to the appropriate

scope of an evidentiary hearing, the Government requested that the Court reopen the hearing to

allow testimony regarding the Defendant's conduct after the stop of his vehicle.  (9/9/10 Gov't

Br. 1)  The Court granted the Government's request (9/16/10 Tr. 11), and additional testimony

---

[1]  Olavarria's declaration also asserts that he did not consent to a search of his person or vehicle.
(Olavarria Decl. (Dkt. No. 8) at ¶ 11)  The Government has never contended that Olavarria
consented to a search, however.

was received on October 22, 2010, concerning the Defendant's conduct after the stop of his vehicle.  (10/22/10 Tr.)

The parties then submitted additional briefing addressing whether Defendant's conduct after the vehicle stop sufficiently attenuated the connection between the unlawful stop and the seizure of the firearm such that admission of the firearm would not violate the Fourth Amendment.

## II.        THE SUPPRESSION HEARING TESTIMONY

During the suppression hearing, the Government called three police officers who were present at the scene:  Lieutenant Edward Barry, Detective Robert Dunsing, and Officer Leo Nugent.  The police officers' testimony addressed both the vehicle stop and the events that took place after the stop.

Olavarria did not testify, but called two witnesses who were passengers in his car that night:  Terrence Williams and Gilbert Colon.  Because these witnesses were called during the first phase of the suppression hearing – when the Government was contending that Olavarria had committed a traffic infraction – their testimony concerns primarily pre-stop events.

During the hearing, it was undisputed that the encounter between the officers and the Defendant leading to discovery of the firearm took place over a period of about five minutes.  (10/22/10 Tr. 50 (Dunsing) ("Q:  Detective Dunsing, from the time that you initially approached the defendant's vehicle until you recovered the gun, approximately how long did the entire encounter take?  A:  Approximately five minutes."); 10/22/10 Tr. 77 (Nugent) ("events . . . happened very fast"); see also 1/29/11 Gov't Br. 9, 14 (stating that the officers and Olavarria had a "five- minute interaction"))

4

Lieutenant Barry and Detective Dunsing are assigned to the NYPD's Bronx Gang Unit.  During the evening of February 20, 2009, they were patrolling the 40th Precinct in an unmarked police vehicle.  (3/2/10 Tr. 11-14)  At about 6:00 p.m., near 149th Street and Morris Avenue, both officers observed a Jeep with a defective center brake light.  (Id. at 13-15)  The officers activated their dome light and followed the Jeep until its driver pulled over near 142nd Street and Morris Avenue.  (Id.)

Detective Dunsing approached the driver's side of the vehicle while Lieutenant Barry approached the passenger side.  (10/22/10 Tr. 3, 80-81 (Nugent); 4/19/10 Tr. 9 (Martinez)) The vehicle had three occupants.  Olavarria was in the driver's seat; Colon was in the front passenger seat; Terrence Williams was in the rear seat.  (10/22/10 Tr. 79 (Nugent); 4/19/10 Tr. 11 (Williams))  Dunsing asked Olavarria for his license, which Olavarria produced.  (3/2/10 Tr. 30-31 (Dunsing); 4/19/10 Tr. 9, 12 (Martinez))

Dunsing testified, however, that Olavarria's demeanor was "belligerent" and "boisterous" and that although he instructed Olavarria to keep his hands on the steering wheel he repeatedly removed them to "pat[] the top of his body."  (10/22/10 Tr. 4, 6 (Dunsing)) Accordingly, Dunsing instructed Olavarria to get out of the car so that Dunsing could conduct a pat-down search.  (Id. at 5; 4/19/10 Tr. 9, 12 (Martinez))  Olavarria got out of the car, but because he was "very combat[ive]," Detective Dunsing instructed him to get back into the car. Olavarria obeyed.  (10/22/10 Tr. 25, 5 (Dunsing))

Two additional police officers then arrived, responding to a call from Lieutenant. Barry.  (Id. at 7)  Detective Dunsing instructed Olavarria to step out of the car a second time. (Id. at 9)  Olavarria complied, but his "right hand went to his front right pocket," where Dunsing

had observed a bulge.  (Id. at 9-10)  At that point, Detective Dunsing reached for the bulge in

Olavarria's front right pocket and "felt the gun through the defendant's pants."  (Id. at 10)

        After Dunsing grabbed the gun in Olavarria's front right pocket, both men "fell to

the ground."  (Id.)  Dunsing does not recall how this fall occurred:  "I don't remember how we

fell.  I don't remember if Mr. Olavarria threw himself down or we just fell down or other people

jumped on top of us.  I don't remember."  (Id. at 10)  When they fell to the ground, Olavarria

began "kicking [and] screaming," and then "tried going underneath the vehicle," such that "[h]e

was dragging [Dunsing] under the car with him."  (Id. at 10-11)  As this occurred, Dunsing was

"screaming" that Olavarria had a gun.  (Id. at 11)  Olavarria was subsequently handcuffed, and a

handgun was recovered from his right front pants pocket.  (Id. at 11-12)

        Nugent's and Barry's testimony largely tracked Dunsing's account but differed as

to certain details.  Nugent testified that when he arrived at the scene Olavarria was in the driver's

seat.  (Id. at 56, 73)  Nugent observed Dunsing direct Olavarria out of the car and pat him down,

and saw Olavarria "ke[ep] trying to go into his pockets" and moving his hands "across the top

portion of [his] body."  (Id. at 56, 58, 73)  After twice telling Olavarria to stop touching his upper

body, Nugent took hold of Olavarria's left hand.  (Id. at 59)  Olavarria pulled his hand away,

however, and Nugent then told Dunsing to put Olavarria in handcuffs.  (Id. at 60)

        Nugent testified that Olavarria then broke away, heading towards the middle of

the street.  (Id.)  He and the other officers grabbed Olavarria and all four men "wound up coming

to the ground."  (Id.)  Olavarria dragged the group toward the underside of the car, while

Dunsing screamed that Olavarria had a gun.  (Id. at 60-61)  Olavarria was then handcuffed and

placed under arrest.  (Id. at 61)

Barry testified that after he approached the vehicle's passenger side, he opened the rear door and instructed the passengers "to put their hands where I can see them."  They complied.  (Id. at 80)  He was aware that Dunsing was speaking with the driver and that the driver's tone was "hostile."  After seeing Olavarria get out and then re-enter the vehicle, Barry decided to call for back-up.  (Id. at 80-81)  Barry was concerned that he and Dunsing were outnumbered by the three occupants of the vehicle.  (Id.)  After two additional officers arrived, Barry "went around the rear of the vehicle to . . . assist" Dunsing in his interaction with Olavarria.  (Id. at 82)  Barry then observed, on the driver's side of the vehicle, "a physical confrontation, a physical fight between the driver of the vehicle, Dunsing, Nugent."  (Id. at 83) This physical altercation lasted "approximately five minutes" and ended when "multiple [additional] police officers showed up . . . and they joined in the apprehension effort."  (Id.  at 84)

## DISCUSSION

### I.   LEGAL STANDARD FOR FINDING ATTENUATION AFTER UNCONSTITUTIONAL SEIZURE

"The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a 'seizure' of the person. . . . The Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity."  Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005).  Here, the Government concedes that the initial stop of Olavarria's vehicle violated the Fourth Amendment because Olavarria had committed no traffic infraction.  (11/11/10 Gov't Br. 2)

When police officers obtain evidence through the "exploitation of . . . illegality," such evidence may be subject to suppression as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).  While the exclusionary rule generally prohibits the admission of evidence gathered during an unlawful search or seizure, a court may admit evidence that police discovered after violating a defendant's Fourth Amendment rights if "the connection between the lawless conduct of the police and the discovery of the challenged evidence ha[s] 'become so attenuated as to dissipate the taint.'"  Wong Sun v. United States, 371 U.S. 471, 491 (1963) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).  In determining whether evidence discovered following an unconstitutional search or seizure is admissible, the court should consider "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  Wong Sun, 371 U.S. at 488 (quoting Maguire, Evidence of Guilt 221 (1959)).  An "intervening independent act of free will" operates to "purge the primary taint of the unlawful invasion."  Wong Sun, 371 U.S. at 486.

"To determine whether a defendant's actions are a product of free will, a court should consider how close in time the illegal search occurred to the defendant's actions, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct."  United States v. Trzaska, 111 F.3d 1019, 1027 (2d Cir. 1997); see also United States v. Awadallah, 349 F.3d 42, 82 (2d Cir. 2003).  "[T]he burden of showing admissibility rests . . . on the prosecution."  Brown v. Illinois, 422 U.S. 590, 604 (1975); see also Trzaska, 111 F.3d at 1027; United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) ("The government bears the burden of proving that the taint has been alleviated."); United States v. Leonardi, 623 F.2d 746,

754 (2d Cir. 1980); <u>United States v. Ghailani</u>, 2010 WL 3956807, at *10 (S.D.N.Y. Aug. 17,

2010).  The Court considers each of the three factors below.

      A.      **<u>Temporal Proximity</u>**

      In determining "whether the connection between the lawless conduct of the police

and the discovery of the challenged evidence has 'become so attenuated as to dissipate the

taint,'" <u>Wong Sun</u>, 371 U.S. at 487 (quoting <u>Nardone</u>, 308 U.S. at 341), this Court must first

consider "how close in time the illegal [stop] occurred to the defendant's actions." <u>Trzaska</u>, 111

F.3d at 1027.  Here, the Government argues that "there was clearly a span between the

impermissible stop and the time the officers uncovered the firearm as the officers had to call for

back up to arrive, wait for back up to arrive and once back up arrived, the officers took the

defendant out of the car."  (11/11/10 Gov't Br. 14)  The Government does not say what "span" of

time passed, but at other points in its briefing – in order to explain discrepancies in the officers'

accounts – it emphasizes how rapidly events took place, and that the entire incident took no more

than five minutes.  <u>See</u>, <u>e.g.</u>, 1/29/11 Gov't Br. 9, 14 (stating that the officers and Olavarria had a

"five- minute interaction")

      The evidence demonstrates that this incident did in fact take place very quickly

and that there was no appreciable break between the illegal stop and Dunsing's discovery of the

firearm.  Dunsing testified that only five minutes passed between the initial approach to

Olavarria's vehicle and his discovery of the gun.  (10/22/10 Tr. 50)  Officer Nugent likewise

testified that only "minutes" passed between his arrival and the discovery of the firearm, and that

events at the scene of the traffic stop happened "very fast."  (10/22/10 Tr. 77)  Accordingly, there

is no evidence here that the taint from the illegal traffic stop was dissipated by the passage of

time.

Brown v. Illinois, 422 U.S. 590, 603-04 (1975) and United States v. Trzaska, 111 F.3d 1019, 1027 (2d Cir. 1997), cited by the Government on this point (11/11/10 Gov't Br. 11) do not support its position.  In Brown, the Supreme Court held that an incriminating statement made by the defendant nearly two hours after his illegal arrest was properly suppressed.  Brown, 422 U.S. at 604 (holding that Miranda warnings had not purged the taint of defendant's unlawful arrest).  Brown provides no support for the Government's temporal proximity argument here.

Trzaska involved an illegal search of the defendant's apartment.  The defendant argued that he had removed firearms from his apartment and brought them to a garage as a result of the illegal search, and that evidence of his actions should be suppressed as "fruit of the poisonous tree."  Trzaska, 111 F.3d at 1026-27.  The Second Circuit disagreed, ruling that the defendant "moved the guns from his apartment to his garage of his own free will."  Id. at 1027. As to the time proximity factor, the Court noted:  "Trzaska moved the guns between one and four hours after the government's illegal entry.  That interval provided Trzaska sufficient time to decide whether he should move the guns."  Id.

There was no comparable interval here – or indeed any meaningful interval at all – between the illegal stop and the discovery of the gun.  Dunsing discovered the firearm as part of a pat-down search that flowed directly from the illegal traffic stop.  (10/22/10 Tr. at 9-10) Accordingly, the temporal proximity factor weighs heavily in favor of suppression.  See United States v. Crawford, 323 F.3d 700, 719-20 (9th Cir. 2003) ("Although '[t]he lack of a significant intervening period of time does not, in itself, require that the evidence be suppressed for want of sufficient attenuation,' United States v. Wellins, 654 F.2d 550, 555 (9th Cir. 1981), it does 'bear[] directly on the probability of taint,' United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1300 (9th Cir. 1988)."); see also Oguns, 921 F.2d at 447 ("the short lapse of time between

the illegal entry and consent, amounting to only a few minutes, did little to dissipate the taint of the illegal entry").

B.       **Presence of Intervening Circumstances**

With respect to the second factor – the "presence of intervening circumstances," Trzaska, 111 F.3d at 1027 – the Government argues that the taint of an illegal stop or arrest is attenuated where a defendant commits a "new wrong" after the illegal search or seizure. (11/11/10 Gov't Br. 13)

While the Second Circuit has not addressed whether a "new wrong" or "new crime" can attenuate the taint flowing from an illegal search or seizure, "[o]ther circuits . . . have held that if a defendant's response to an illegal stop 'is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime' and any evidence uncovered by a search incident to that arrest is admissible." United States v. Crump, 62 F. Supp. 2d 560, 568 (D. Conn. 1999) (quoting United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982)).  The Government cites these cases in opposing Olavarria's motion to suppress.  See 11/11/10 Gov't Br. 10-11 (citing United States v. Dawdy, 46 F.3d 1427, 1427, 1429-30 (8th Cir. 1995) (finding that resisting an illegal arrest constitutes a crime under Iowa law and a "new crime" for attenuation purposes); United States v. Waupekenay, 973 F.2d 1533, 1535 (10th Cir. 1992) (taint from officers' illegal entry into home attenuated where defendant threatened officers with a rifle and was charged with assault);  United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (taint from illegal stop attenuated where defendant fired shots at officers); United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971) (taint from illegal arrest dissipated where defendant "fled driving at speeds up to 115 m.p.h." and "shot directly at [the arresting officer]")  The logic of these cases is that a defendant is not given "carte blanche to commit further criminal acts so long

as they are sufficiently connected to the chain of causation started by the police misconduct."

Bailey, 691 F.2d at 1017. [2]

Here, the Government argues that Olavarria committed two intervening crimes after the unlawful traffic stop.  First, it claims that he committed obstruction of governmental administration under New York Penal Law § 195.05.  That statute provides:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act.

N.Y. Penal Law § 195.05.

"[A] defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function[, however,] unless it is established that the police were engaged in authorized conduct."  People v. Lupinacci, 191 A.D.2d 589 (2d Dept. 1993) (defendant "struggled with the police to avoid being handcuffed, and walked away from the arresting officer, ignoring orders to stop"; judgment of conviction under Penal Law § 195.05 reversed; "the police were not authorized to attempt to detain the defendant because, under the circumstances, they did not possess a reasonable suspicion that the defendant was involved in criminal activity.  Thus, the defendant was free to walk away, and any attempt to detain him was unauthorized.").  Where the police are engaged in an illegal arrest,

---

[2]  The Government provides no case law support for its argument that the "intervening circumstances" need not be a crime, but can be any wrongful conduct.  All of the cases relied on by the Government involve the commission of a "new crime" after the illegal search, seizure or other Government action.  United States v. Remington, 208 F.2d 567, 570 (2d Cir. 1953), cited by the Government (11/11/10 Gov't Br. 12-13) is not to the contrary.  Although Remington states that the taint of the Government's illegal conduct may be dissipated by a "new wrong committed by the defendant," id. at 570, the "new wrong" in that case was in fact a crime – perjury – committed during a trial, albeit on an illegally procured indictment.  Id. at 569.  Accordingly, that case does not stand for the proposition that a defendant's non-criminal but "wrongful" conduct can purge the taint of unlawful government action.

other unlawful seizure, or an unlawful search, no charge for obstruction of governmental

administration will lie.  See, e.g., Williams v. City of Mount Vernon, 428 F. Supp. 2d 146, 157

(S.D.N.Y. 2006) (officers lacked probable cause to arrest defendant for obstructing governmental

administration – where their initial stop of the defendant was not supported by reasonable

suspicion – because "a conviction for obstructing governmental administration cannot stand

unless it is established that the police officers were engaged in lawful conduct"); United States v.

Fambo, No. 05 Cr. 70S, 2006 WL 2990641, at *8, *18-*19 (W.D.N.Y. Oct. 19, 2006)

(unconstitutional traffic stop; police violated "the defendant's right to be free from an unlawful

search and seizure when they forcibly removed him from his vehicle and searched his person";

although the defendant had "disobeyed [numerous] commands to keep his hands on the steering

wheel [and] step out of the vehicle," there was no violation of Penal Law § 195.05, because the

underlying police action had not been lawful (citing Lupinacci, 191 A.D.2d at 595)); People v.

Edwards, 65 A.D.3d 829, 831 (4th Dept. 2009) (overturning conviction for obstruction of

governmental administration where initially lawful traffic stop became unconstitutional because

of length of detention; "[b]ecause the Deputies' detention of defendant was unlawful by the time

of the alleged assault, they were not engaged in the performance of a lawful duty. . . . [and] the . .

. count of the indictment[] charging defendant with obstructing governmental administration in

the second degree . . . should have been dismissed"); People v. Greene, 221 A.D.2d 559, 560 (2d

Dept. 1995) (overturning conviction for obstructing governmental administration; "[a] defendant

may not be convicted of . . . interfering with an officer in the performance of an official function

unless it is established that the police were engaged in 'authorized' conduct"); People v. Richter,

265 A.D. 767, 773 (1st Dept. 1943) (defendant could not be found guilty of obstruction where he

resisted unlawful seizure of his property; "[i]n the absence of a lawful seizure there was no

13

unlawful interference"); People v. Vogel, 116 Misc. 2d 332, 333 (App. Term, 2d Dept. 1982)

("Just as a defendant cannot be convicted of resisting arrest unless the People show that the arrest

was lawful, so a defendant cannot be convicted of obstructing governmental administration for

interfering with an officer in the performance of an official function unless it be proved that the

official function was an authorized one"); People v. O'Connor, 257 N.Y. 473 (1931) (per

curiam) (conviction for "resisting an officer while 'in the performance of his duty'" reversed;

"[where] the arrest was illegally made; the officer had no right to search the prisoner; the

prisoner did not resist an officer in the performance of any duty; and no crime was committed").

      Here, the Government has conceded that the officers' initial stop of Olavarria's

vehicle was unlawful.  See 9/9/10 Gov't Br. 6.  Accordingly, when Detective Dunsing began a

pat-down search shortly after the illegal traffic stop, he was not engaged in conduct authorized

by law, and the Government may not argue that the taint from the unlawful traffic stop was

attenuated by Olavarria's commission of the "new crime" of obstruction of governmental

administration.

      The Government also argues (11/11/10 Gov't Br. 18-20) that Olavarria's post-

stop conduct constitutes disorderly conduct under Penal Law § 240.20(1) and (7), which

provides:

> A person is guilty of disorderly conduct when, with intent to cause public
> inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
>
> 1.  He engages in fighting or in violent, tumultuous or threatening behavior; or . .
>
> 7.  He creates a hazardous or physically offensive condition by any act which
> serves no legitimate purpose.

Penal Law § 240.20.

Under New York law, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes 'a potential or immediate public problem.'" People v. Weaver, 16 N.Y.3d 123, 128 (2011) (quoting People v. Munafo, 50 N.Y.2d 326, 331 (1980)).  In assessing whether a defendant's conduct constitutes "a potential or immediate public problem," "relevant factors . . . are the time and place of the episode . . . the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances."  Id. (citing People v. Pritchard, 27 N.Y.2d 246, 248-49 (1970)); see also Munafo, 50 N.Y.2d at 331 ("In deciding whether an act carries public ramifications, courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode under scrutiny.")  Accordingly, disorderly conduct convictions are set aside where "the differences between [a law enforcement officer] and the defendant were confined to these two disputants rather than spread to the public," Munafo, 50 N.Y.2d at 332, and where "there . . . was not[] any obstruction of passage, vehicular or pedestrian, of the public at large." Id.; see also People v. Szepansky, 25 Misc.2d 239 (N.Y. Cty. Ct. 1960) (reversing disorderly conduct conviction where only police officers and the defendant and his companions were present).

Here, the Government – which bears the burden of demonstrating that Olavarria committed a "new crime" that attenuated the effects of the illegal traffic stop, see Brown, 422 U.S. at 604 – has not offered evidence that the alleged five-minute altercation between the defendant and the police officers became "'a potential or immediate public problem.'" Weaver, 16 N.Y.3d at 127-28 (quoting Munafo, 50 N.Y.2d at 331).  While the encounter took place on a

15

public street in the Bronx at about 6:00 p.m. (3/2/10 Tr. 13), the fact that this incident occurred in a public place is, standing alone, insufficient to bring it within the purview of the disorderly conduct statute.  See People v. Pritchard, 27 N.Y.2d 246, 249 (1970) (reversing disorderly conduct conviction based on fight in dance club) (quoting People v. Perry, 265 N.Y. 362, 365 (1934) (finding evidence legally insufficient to establish disorderly conduct even though fight occurred in a public venue and "onlookers gathered 'to gratify curiosity or a desire for amusement'")).

        The Government has offered no evidence that any member of the public observed the incident, that anyone was in the vicinity of the traffic stop, or that the dispute extended beyond Olavarria and the officers.  Given that the entire incident took no more than five minutes, it is unlikely that Olavarria's conduct attracted notice or presented any risk of obstructing vehicular or pedestrian traffic.  While one officer testified that Olavarria broke away from the officers and "headed towards the middle of the street" before falling to the ground with several officers (10/22/10 Tr. 60 (Nugent)), the two other police witnesses – including Detective Dunsing, Olavarria's principal antagonist – had no such recollection.  (See 10/22/10 Tr. 10-12, 93-94)  Indeed, Lieutenant Barry flatly denied that Olavarria broke away to the middle of the street, stating that he "would have noticed" if this had occurred.[3]  (Id. at 93-94)

        Given this factual record, the Government has not met its burden of demonstrating that Olavarria commited the "new crime" of disorderly conduct.[4]

---

[3]  Courts have also rejected disorderly conduct charges premised on "tumultuous behavior" resulting from an unlawful arrest.  See, e.g., People v. Doe, 85 Misc. 2d 592, 596 (N.Y. City Ct. 1976).

[4]  The Government's argument that Olavarria's post-stop conduct attenuated the taint of the illegal traffic stop also ignores the fact that Detective Dunsing discovered the firearm in Olavarria's pocket before Olavarria took any action that could conceivably be viewed as obstruction of governmental administration or disorderly conduct.  Dunsing testified that he

Because the Government has not shown that Olavarria engaged in a "new crime"

after the illegal traffic stop, the "intervening circumstances" factor likewise weighs in favor of

suppression.[5]

---

reached for the bulge in Olavarria's pocket as part of a pat-down search following the illegal
traffic stop. Dunsing felt the gun in Olavarria's pocket before any scuffle with Olavarria took
place. Indeed, if the officers' account is credited, it was Dunsing's discovery of the gun that was
the catalyst for the scuffle with Olavarria.

[5] United States v. Bellamy, 592 F. Supp. 2d 308 (E.D.N.Y. 2009) and United States v. Crump,
62 F. Supp. 560 (D. Conn. 1999), cited by the Government (11/11/10 Gov't Br. 21-23), are not to
the contrary. In Bellamy, police officers conducted an illegal Terry stop and found marijuana on
Bellamy. Id. at 314. When the officers began to place the defendant in handcuffs, a struggle
ensued. Bellamy used his shoulder to strike an officer in the chest, causing him to fall down a
flight of stairs. Both officers then grabbed hold of the defendant, who "dragged [them] down the
stairs [and] out into the street." Id. During the struggle, Bellamy dropped a handgun. Bellamy
then fled, but was later apprehended. Id. at 314-15.

Bellamy was charged with, inter alia, being a felon in possession of a firearm, possession of
marijuana with intent to distribute it, and using and carrying a firearm during a drug trafficking
crime. Id. at 308. He moved to suppress the marijuana and the firearm on the grounds that the
police lacked reasonable suspicion for the Terry stop.

The court agreed that the officers lacked reasonable suspicion to stop the defendant, id. at 316-
320, and accordingly suppressed the marijuana. Id. at 321. However, the court denied the
motion to suppress the firearm, because "[w]hile [the defendant]'s shouldering of [the officer]
and subsequent struggle with and escape from both officers were consequent to the officers'
unlawful stop, [the defendant]'s acts constituted illegal acts – assault and resisting arrest – and as
such, purged any subsequently discovered evidence of the taint from the unlawful stop." Id. at
321.

Bellamy is not applicable here, because the Government does not contend that Olavarria
committed the "new crime" of assault or resisting arrest. Instead, the Government contends that
Olavarria committed the New York State crimes of obstruction of governmental administration
and disorderly conduct. For the reasons stated above, the Government has not demonstrated that
Olavarria committed either of these offenses.

United States v. Crump, 62 F. Supp. 2d 560 (D. Conn. 1999) is likewise inapposite. In that case,
during an illegal Terry stop, the defendant began scuffling with a police officer conducting a pat-
down search and was arrested. Id. at 568. After the defendant's arrest, police recovered a
handgun in the defendant's pants pocket. The defendant later moved to suppress the firearm,
arguing that it was the fruit of an unconstitutional search. Id. at 561, 563. The court denied the
motion to suppress. Id. at 569.

### C.    **Purpose and Flagrancy of Official Misconduct**

The final factor that this Court must consider in conducting an attenuation

analysis is the "purpose and flagrancy of the official misconduct."  Trzaska, 111 F.3d at 1027.

Here, there is no reason to distrust the officers' accounts that – when they stopped Olavarria's

vehicle – they believed that the Jeep's defective brake light was a traffic violation.  Indeed,

litigation concerning defendant's motion to suppress continued for nine months on the premise

that a defective center brake light was a violation of New York's Vehicle and Traffic Law.  It

was not until the Court requested a statutory citation supporting this proposition that the

Government conceded that a malfunctioning center brake light does not violate any provision of

New York law.

In determining whether police action is reasonable under the Fourth Amendment,

however, "simple 'good faith on the part of the arresting officer is not enough.'"  Terry v. Ohio,

392 U.S. 1, 22 (1968) (quoting Beck v. Ohio, 379 U.S. 89, 97 (1964)); see also Whren v. United

States, 517 U.S. 806 (1996) (subjective intent of officer is irrelevant to whether there was

---

The Crump court noted that under Conn. Gen. Stat. §§ 53a-167a and 53a-23, a person may not use "'physical force to resist an arrest by a reasonably identifiable peace officer, whether such arrest is legal or illegal.'"  Id. at 569 (citing Conn. Gen. Stat. § 53a-167a and quoting Conn. Gen. Stat. § 53a-23).  The Crump court concluded that, in interfering with the pat-down search, the defendant had engaged in "an intervening illegal act and a new, distinct crime" under Connecticut law.  Id.  "The commission of the interfering offense by the defendant provided a sufficient causal break from the illegal pat-down so as to allow for the admissibility of the firearm as evidence."  Id.

Crump does not assist the Government here, because that case turns on the application of Connecticut statutes.  Because the Government has not demonstrated that Olavarria violated either of the New York statutes it relies on, there is no proof of an intervening crime.

Bellamy and Crump are also distinguishable in that in both cases a gun was discovered as a result of the defendant's physical altercation with police officers.  Here, Detective Dunsing discovered the firearm before any physical altercation with Olavarria took place.

probable cause to stop a vehicle); <u>United States v. Ferguson</u>, 130 F. Supp. 2d 560, 565 (S.D.N.Y. 2001) ("the subjective intent of the police is not a factor when determining whether probable cause existed").  "The fact that an officer truly believed that he saw a violation does not necessarily make it reasonable for him to suspect that the violation occurred.  Good faith alone does not make suspicion reasonable."  <u>United States v. Stewart</u>, 604 F. Supp. 2d 676, 682-83 (S.D.N.Y. 2006).  Here, even assuming that the officers "truly believed" that Olavarria had committed a traffic infraction, that subjective good faith belief does not justify their traffic stop. There is no overarching "subjective good faith exception" to the requirement that traffic stops be supported by "probable cause or reasonable suspicion that the person stopped has committed a traffic violation."  <u>Holeman v. City of New London</u>, 425 F.3d 184, 190 (2d Cir. 2005).

*          *          *          *

The Court concludes that the officers' subjective good faith in stopping Olavarria's vehicle does not overcome the other two factors that must be considered here: temporal proximity and lack of intervening circumstances.  The factual record demonstrates that the officers' recovery of the firearm from Olavarria was part and parcel of an illegal traffic stop. There was no meaningful break in time between the illegal traffic stop and the initiation of the pat-down search that led to recovery of the weapon.  Within five minutes of stopping Olavarria's vehicle, Detective Dunsing grabbed the bulge in Olavarria's front pants pocket and discovered the firearm, leading to the scuffle at issue.  Even if discovery of the firearm had not preceded Olavarria's alleged obstructive behavior, the Government has not demonstrated that, in scuffling with the officers, Olavarria committed a "new crime."  Under these circumstances, the Government has not sustained its burden of proving that the Defendant's conduct attenuated the taint of the police officers' initial unlawful stop.  There was no "intervening act of free will" that

19

operated to "purge the taint of the unlawful [traffic stop]." <u>Wong Sun</u>, 471 U.S. at 487.  Instead,

the evidence at issue was recovered "by exploitation of the illegal[] [stop]." <u>Id</u>. at 488.

Accordingly, the Defendant's motion to suppress the firearm and any other evidence recovered at

the February 20, 2009 traffic stop must be granted.

### <u>CONCLUSION</u>

The Defendant's motion to suppress (Dkt. No. 4) is GRANTED.  The Clerk of the

Court is directed to terminate the motion.

Dated: New York, New York
       April 20, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge